CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

OCT 3 1 2008

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RANDALL C. TURNER** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv0006 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:  GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits

### I. Background and Standard of Review

The plaintiff, Randall Turner, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Turner's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may

1

be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Turner filed his application for DIB and social security income, ("SSI"), on June 23, 2003, alleging disability as of January 31, 1991, due to social anxiety disorder. (Record, ("R."), at 13, 44-46, 50-83.) The claim was denied initially and upon reconsideration. (R. at 23-24, 25-34, 84-90.) Turner then requested a hearing before an administrative law judge, ("ALJ"), on November 5, 2003. (R. at 35-38.) A hearing was held before the ALJ on August 25, 2004, at which Turner was represented by counsel. (R. at 228-259.) By decision dated September 3, 2004, the ALJ found that Turner was disabled for purposes of SSI benefits, but that he was not eligible for DIB based upon expired earnings. (R. at 9-11.)

After the ALJ issued his decision, Turner pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council with regard to his DIB claim. (R. at 5-8.) The Appeals Council denied Turner's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-8) *See* 20 C.F.R. § 404.981 (2008). Thereafter, Turner filed an action seeking review of the ALJ's unfavorable decision. (R. at 226) By decision dated March 27, 2006, the United States District Court for the Western District of Virginia remanded the case back to the ALJ. (R. at 282-301.) The Appeals Council subsequently vacated the final decision of the Commissioner of Social Security and remanded the case back to the ALJ for further proceedings consistent with the

2

order of the court. (R. at 279-281.) A hearing was held before the ALJ on July 25, 2006, at which Turner was represented by counsel. (R. at 319-350.)

By decision dated September 19, 2006, the ALJ denied Turner's claim. (R. at 266-274.) The ALJ found that Turner met the disability insured status requirements of the Act for disability purposes through September 30, 1996, but not thereafter. (R. at 272.) The ALJ determined that Turner had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 272.) The ALJ also found that prior to his last date insured, September 30, 1996, the medical evidence failed to reveal the existence of a "severe" impairment imposing significant work-related limitations based upon the requirements listed in 20 C.F.R. § 404.1520(c). (R. at 273.) Therefore, the ALJ found that Turner was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at. 273.) *See* 20 C.F.R. § 404.1520(g) (2008).

After the ALJ issued his decision, Turner pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 265.) The Appeals Council denied Turner's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 260-262.) *See* 20 C.F.R. § 404.981 (2008). Thereafter, Turner filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Turner's motion for summary judgment, filed July 9, 2008, and on the Commissioner's motion for summary judgment, filed October 7, 2008.

*II. Facts*

3

Turner was born in 1957, which classified him as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 41.) According to the record, Turner has a high school and college education, as well as past relevant work experience as a Department of Motor Vehicles, ("DMV"), registration clerk. (R. at 270.) Turner has not engaged in substantial gainful activity since his alleged onset date. (R. at 270.) He alleges that he became disabled on January 31, 1991, due to social anxiety disorder with a genetic component since early childhood; inability to interact with people; lack of social and communication skills; and high anxiety associated with tasks such as talking and writing in front of others.[1] (R. at 270.)

At Turner's hearing before the ALJ on July 25, 2006, he testified that he was not only disabled at the time of the hearing, but that he was disabled prior to September 1996. (R. at 323.) Turner stated that he had most recently been employed as a registration clerk at the DMV in Virginia for 13 years. (R. at 323.) He stated that he left this job in January 1991. (R. at 323.) Turner testified that he never had to interview for the job because his mother had gotten him the job and his sister trained him because she had already been working there part-time. (R. at 324.) Turner stated that he would have had difficulty with a job interview because he is a "really nervous person." (R. at 324.) Turner noted that he had difficulty while working at the DMV. (R. at 324.) When asked about the type of difficulty, Turner stated that the high volume of people in and out of the building made him very nervous, thus making it hard for him to work. (R. at 324.) Turner stated that the DMV hired a part-time worker to fill in for him when he needed time off due to his condition. (R. at 325.)

---

[1] Turner alleges that he was disabled from approximately January 1991 to September 1996. (R. at 322.) However, the administrative record is devoid of any medical evidence from that time period. (R. at 322.)

4

Upon termination from his job, Turner stated that he returned to college. (R. at 325.) Turner testified that he had dropped out of college after his father passed away in 1994. (R. at 325.) Turner also admitted that he was worried about going back to college because of his anxiety disorder, which would hinder his ability to give reports, stand up in class or participate in group discussions. (R. at 325.) He stated that he would sometimes have to take a lower grade, drop a class or even change his major as a result of his condition. (R. at 325.) When asked about withdrawing from several college classes, Turner stated that had had to withdraw from one class due to his anxiety. (R. at 326.) Turner also stated that he took an "incomplete" in a class after his father had been diagnosed with cancer, which ultimately forced him to drop out of college because he could not keep up with his workload. (R. at 326.)

Turner stated that at the time of his father's death, he was as nervous and had as much trouble concentrating as he does now. (R. at 327.) Turner also noted that he has always had difficulty being around other people. (R. at 327.) He testified that, when he was in college, he tried to get his class schedule down to two or three days per week to avoid being around people. (R. at 327.) Turner testified that, in between classes, he would sit in his car to avoid people. (R. at 327.) Turner testified that he did not attend his college graduation because he was too nervous. (R. at 334.) When asked about his family, Turner stated that he did not tell his family members about his condition because he came from a religious family where "you should be able to handle things like that." (R. at 328.) He stated that he would often not attend family events, such as funerals or weddings, so as to avoid being around people. (R. at 328.)

5

When asked about his social activities, Turner stated that he had none, and that he even cuts his own hair to avoid going to a barber. (R. at 329.) He stated that during his time in college, he saw a counselor, Dr. Cori Rosencrantz. (R. at 329.) Turner testified that he saw Dr. Rosencrantz for a few months, but stopped seeing her because he needed to care for his father who had just been diagnosed with cancer. (R. at 329.) Turner stated, however, that the records from his visits had been destroyed after Dr. Rosencrantz left the college. (R. at 329.) Turner testified that it had been recommended by his psychology professor, Dr. Mary Frank, that he seek counseling. (R. at 330.) Turner testified that he had tried to contact Dr. Frank by sending an email to another professor named Dr. Mary Darcy. (R. at 330.) Dr. Darcy also had recommended that Turner seek counseling. (R. at 331.) Turner testified that he did not seek any additional counseling after his sessions with Dr. Rosencrantz, prior to entering Frontier Health in 2003. (R. at 332.) Turner stated that the last counseling he received was in August 2005 from Dr. Ludgate, whom he saw for about a year, but stopped going because of "transportation problems." (R. at 332-333.)

Turner testified that the death of his father caused his condition to worsen, especially given the fact that Turner's grandmother had passed away five months prior to his father's death. (R. at 331.) Turner stated that, although he tried to return to school following those two deaths, he had lost his interest in art classes, and was simply looking to get from one day to the next. (R. at 331.) When asked about medical treatment, Turner testified that he did not receive any medication from 1991 to 1996. (R. at 334.)

6

Thomas Schacht testified as a medical expert at the hearing. (R. at 334.) Schacht testified that, based on what he had heard and seen, Turner has social anxiety disorder, panic disorder, social phobia, avoiding personality and possible concerns about caffeine use as a possible accelerant for anxiety. (R. at 336.) When asked about whether there was evidence in the record that Turner was disabled prior to September 30, 1996, Schacht stated that there were several relevant life history records that can speak to this. (R. at 337.) He noted that, while severe impairment from an anxiety disorder might manifest itself in difficulties with attendance or reliability at school, Turner's high school record did not show any excessive absences. (R. at 337.) Schacht also noted that another possible way that a severe impairment could be manifested was with impaired academic achievement. (R. at 337.) However, he pointed out that there was no evidence of this, as Turner had a Lorge Thorndyke IQ of 106, which is average, and he graduated in the top third of his high school class, which is above average. (R. at 337.) Schacht also pointed out evidence that Turner had participated in some classes that would have required oral presentations, such as foreign language classes. (R. at 337.)

With regard to college, Turner's transcript indicated that he withdrew from four classes, but it was unclear whether those classes would have required oral presentations. (R. at 338.) Schacht noted that a letter in the record showed that Turner dropped one course after allegedly being diagnosed with elevated blood pressure at Coburn Communicare. (R. at 338.) Turner reported that the elevated blood pressure was associated with situational anxiety. (R. at 338.) Schacht stated that the remainder of his college transcript showed that the overall grade trajectory followed by the Turner's college career was upward. (R. at 339.) Although Turner

7

failed two courses early on, he received A's and B's by his senior year. (R. at 339.)

When asked whether Turner had a disabling condition, Schacht opined that, without medical records from the period of time Turner was in college, it would be difficult to tell whether Turner did in fact have elevated blood pressure that led to his anxiety. (R. at 339.) Schacht noted that there was evidence that Turner had been drinking heavily during that time, which could have led to elevated blood pressure. (R. at 339.) Schacht testified that given the overall academic history and upward trajectory, Turner was able to function, with some accommodations on his part. (R. at 340.) Schacht noted that Turner never asked for any special accommodations from the college. (R. at 340.) He also noted that, while Turner had attempted college on prior occasions, but was unable to continue due to his anxiety, the fact that he was able to continue and complete his college degree indicated that his condition had improved. (R. at 341.) Schacht opined that Turner's more recent activities such as speaking in class or playing the piano in church are inconsistent with someone with marked impairment from social anxiety. (R. at 341.) Rather, Schacht opined that such assertions hinged on a credibility determination made by the ALJ. (R. at 341.)

Schacht also was asked whether Turner's impairments were as severe during the time of his father's death in 1993 to September 1996, as they were at the time of the hearing, Schacht responded that Turner's impairments were likely to be more severe today than they were back then. (R. at 348.) Schacht reasoned that Turner's testimony indicated that he cannot do things now that he must have been able to then in order to go to school. (R. at 348.) Schacht noted that Turner

8

testified that he can barely leave the house now; however, he must have been able to leave the house from 1993 to 1996 in order to go to college. (R. at 348.) Schacht additionally noted that after Turner's college graduation in December 1994, there are no records of his mental impairments from December 1994 to September 1996, other than Turner's testimony. (R. at 349.)

The following medical evidence is outside of the relevant time period for purposes of this decision. However, for purposes of clarity of the record, both the ALJ and this court have included a summarization of such evidence. In rendering his decision, the ALJ reviewed records from Jeffery H. Leblang, a licensed counseling professional; Cumberland Mountain Community Services; Eugene Hamilton, Ph.D., a state agency psychologist; Brian E. Warren, Ph.D.; Hugh Tenison, Ph.D., a state agency psychologist; Sharon J. Hughson, Ph.D.; Wise County Behavioral Health Services; School Records from University of Virginia's College at Wise; and School Records from Virginia Public Schools.

On July 1, 2003, Turner presented to Jeffery H. Leblang, a licensed counseling professional, ("LCP"), at Cumberland Mountain Community Services for crisis counseling. (R. at 97-100.) Leblang reported a history of social phobia and public speaking anxiety whose onset was around age 12 or earlier. (R. at 97.) Leblang's report noted that Turner recalled having marked anxiety while having to give a talk to his class as part of a class assignment at age 12. (R. at 97.) Leblang noted that Turner graduated from UVA-Wise with a Bachelor's degree in Psychology and Sociology. (R. at 97.) Leblang reported that Turner recalled having to withdraw from a personality class in order to avoid giving a class presentation. (R. at 97.) Leblang noted that Turner's father and grandfather

9

passed away within four months of each other, and that Turner currently lived with his mother who received a modest fixed income. (R. at 97.) Leblang noted that Turner has not maintained relationships with former friends and has stayed at home except to grocery shop and attend medical appointments, as Turner reports feeling uncomfortable in crowds. (R. at 97.) Leblang stated that Turner has managed his anxiety by avoiding situations that require him to present or speak in public or generally to be part of an interactive group. (R. at 97.) Leblang reported that Turner's subjective mood was depressed and he has concluded that he is "never going to make [his] mark in the world." (R. at 97.)

The mental status examination administered by Leblang revealed restless motor activity, a depressed and anxious mood, decreased energy level and limited insight and judgment. (R. at 97-98.) Leblang discussed the possibility of behavioral and cognitive interventions, in addition to an evaluation for whether an antidepressant such as Paxil could help reduce his social anxiety. (R. at 99.) Turner indicated that he would prefer not to take any medications. (R. at 99.) Turner also expressed some ambivalence about pursuing counseling, as he doubted whether he could actually change. (R. at 99.) However, Leblang noted that Turner decided to schedule another appointment in order to pursue more crisis counseling. (R. at 99.) Leblang diagnosed Turner with social phobia and dysthymic disorder. (R. at 101.)

On July 25, 2003, Leblang contacted Turner to reschedule his appointment originally set for July 31, 2003, due to a conflict with his schedule. (R. at 96.) Turner then stated that he was planning on canceling the appointment anyway, because although he decided to schedule the appointment at the last session, by the

10

time he had entered his car, he was already experiencing a sense of dread about returning. (R. at 96.) He stated that he continued to entertain the thought that he was genetically/constitutionally determined to experience public speaking anxiety/social phobia and that perhaps this was a condition that could not be helped through counseling. (R. at 96.) Leblang discussed several other options with Turner, such as the possibility that Turner set aside one month in order to have the opportunity to read about social phobia and public speaking, so as to make a more informed decision about whether to close his case. (R. at 96.) Turner was to call Leblang by the end of August to indicate whether he would like to continue counseling. (R. at 96.)

On September 30, 2003, Cumberland Mountain Community Services issued a case closure discharge summary after Turner's only crisis counseling session. (R. at 92.) In this report, Leblang stated that Turner would need to develop increased motivation to attempt to overcome expressed barriers to counseling in order for counseling to be viable. (R. at 93.) On October 1, 2003, Cumberland Mountain Community Services issued a quarterly review of the individual services plan, in which Leblang noted that Turner had not contacted him as of September 30, 2003, and therefore Leblang would close his case. (R. at 94.) Leblang opined that progress towards the alleviation of his chief complaints could not be adequately ascertained due to the fact that Turner only attended the initial appointment. (R. at 94.)

On August 27, 2003, Eugene Hamilton, Ph.D., a state agency psychologist, performed a Psychiatric Review Technique form, ("PRTF"), on Turner. (R. at 102.) Hamilton diagnosed Turner with social anxiety, depression, agoraphobia,

11

obsessive compulsive disorder, single episode, severe, and avoidant personality disorder, all of which interfered with all aspects of his daily life. (R. at 106.) Hamilton noted that Turner had formed no long lasting personal relationships and he was truly tapped by his own psychological symptoms in a life with little pleasure or promise for change. (R. at 106.) Hamilton also noted that Turner was not spontaneous, his sleep was disturbed, he experienced frequent nightmares, slept fully clothed on top of his bed, had a sporadic appetite with some binge eating and wide variation in weight, and was easily upset. (R. at 106.) In rating Turner's functional limitations, Hamilton noted that he had no restrictions of activities of daily living, no difficulties in maintaining concentration, persistence, or pace, no episodes of decompensation, each of extended duration, and only mild difficulties in maintaining social functioning. (R. at 116.) In his consultant notes, Hamilton stated that although Turner had recently had an initial appointment for treatment, he was extremely ambivalent and unsure about following up on the treatment which was offered. (R. at 118.) Hamilton noted that at the time of the evaluation, Turner had not complied with the treatment recommendations. Hamilton determined that Turner's mental allegations were partially credible and that his mental condition was "nonsevere." (R. at 118.)

On September 23, 2003, Turner presented to Brian E. Warren, Ph.D., for a pain patient profile, personality assessment inventory and mental status examination. (R. at 120.) On mental status examination, Warren noted that although Turner drove himself to the interview, he usually avoided driving because of his extreme anxiety. (R. at 120.) Turner stated that he had been "worried about coming here for 15 days" and stated that "[he] was afraid [he] wouldn't make it." (R. at 121.) Warren noted that Turner appeared immediately as an extremely

12

anxious and depressed individual who was restless and fidgety. (R. at 121.) Turner's chief complaints focused on lifelong struggle with social anxiety. (R. at 121.) Turner stated that "[a]ll my life I have been anxious in social situations, even since I was a child." (R. at 121.) Warren noted that Turner's social phobia is clearly evident, as he was never able to make oral presentations in school and he appeared to have structured his entire day to day life to avoid social contact. (R. at 121.) Warren further noted that Turner does not speak on the phone and does not go out in public unless he has to, as he fears panic attacks might occur. (R. at 121.)

Warren's further observations noted that Turner's mood was depressed, he was restless at times, he was not spontaneous and he was sleep disturbed. (R. at 121.) Turner averaged about three to five hours of sleep per night and had frequent awakenings without being able to return to sleep. (R. at 121.) Warren noted that Turner reported a sporadic appetite with some binge eating and wide variation in weight, with weight fluctuations between 170 and 340 pounds. (R. at 121.) Warren noted that Turner was sad on a daily and persistent basis and was highly self-critical and felt guilty about not working. (R. at 121.) Turner stated to Warren that "I just feel hopeless at times. I just wish I could have a normal life." (R. at 121.) Turner denied thoughts of suicide, stating that "I wouldn't do that to my family." (R. at 121.) Warren further noted that Turner was constantly fatigued and without energy, was unable to trust himself to make decisions and has poor memory function. (R. at 121.) Turner stated that he was particularly troubled by his frequent memory loss of names, dates, conversations, phone numbers and medications. (R. at 121.) Turner reported past use of alcohol, however no alcohol use for over 10 years, and he continued to smoke tobacco. (R. at 121.)

13

Warren further noted that Turner was constantly nervous and anxious, that he denied tremors and that he felt shaky inside and was unable to relax. (R. at 121.) Turner exhibited symptoms of hyperventilation including numbness in his face and hands. (R. at 121.) Turner also stated that he experienced generalized weakness in his legs, excessive perspiration, chest tightness, difficulty swallowing, feelings of choking and frequent upset stomach. (R. at 121.) Turner also noted that he engaged in frequent compulsive checking behavior such as checking locks on doors, the stove and hand washing 15-20 times per day. (R. at 121.) Warren noted that there were no psychotic symptoms of unusual mental content. (R. at 121.)

Warren noted that Turner's daily activities were quite limited. (R. at 122.) Warren found that Turner watched television but with little interest, he rarely visited anyone, he did not socialize and he found virtually no pleasure and enjoyment in living. (R. at 122.) Warren noted that Turner did some chores such as his own laundry, tending a garden at times and he would go to the store for his mother. (R. at 122.) Turner used to attend church and even play the piano at church but had to stop because of his overwhelming anxiety. (R. at 122.) Overall, Warren concluded that the mental status examination showed a severely anxious and depressed man who had chronic generalized symptoms of anxiety and depression, as well as more focused, phobic anxiety related disorders such as social phobia, agoraphobia and obsessive compulsive disorders. (R. at 122.)

The results of Warren's personality assessment inventory showed no indication of malingering or efforts to manage a negative or positive impression. (R. at 122.) Warren stated that the scored profile showed marked elevations on

14

clinical scales suggesting likely multiple diagnoses. (R. at 122.) Warren noted that depression was a key feature of the profile with strong somatic preoccupation often seen in chronically depressed individuals with chronic physical ailments. (R. at 122.) He further noted that the profile pattern was characterized by excessive worry and rumination and pathologically high levels of anxiety. (R. at 122.) Overall, Warren stated that the profile suggested diagnoses of major mood and anxiety disorders. (R. at 122.) In addition, Warren noted that suicidal thoughts were likely, as well as extremely low physical and psychological energy. (R. at 122.) Warren noted that the profile was also characteristic of individuals with discomforting levels of tension and stress, evidenced partly by Turner's sweaty palms, trembling, palpitations and shortness of breath. (R. at 122.) In addition, Turner indicated that he experienced fear in certain situations, and such a pattern was consistent with significant phobic symptoms and behaviors. (R. at 122.) Warren noted that these behaviors were so intense that they interfered in a very significant way with his day to day life. (R. at 122.) Warren stated that Turner was likely to have multiple phobias or a more distressing phobia such as agoraphobia than to suffer from a simple phobia. (R. at 123.)

Upon administering the pain patient profile, which examined the primary symptoms and dimensions of depression, anxiety and somatization, Warren concluded that the test did yield a valid profile. (R. at 123.) Warren found that Turner's scores on scales measuring symptoms of depression and anxiety were well above average. (R. at 123.) Warren noted that Turner was experiencing severe symptoms of depression including fatigue, listlessness and appetite and sleep disturbance associated with chronic pain. (R. at 123.) Warren opined that Turner's suicide potential should be carefully monitored despite his denial of

15

thought and intent. (R. at 123.) Warren also found that Turner was markedly anxious with generalized apprehension and inner turmoil, and his temper and impulse control were being affected by the scope and magnitude of his physical and emotional pain. (R. at 123.) Warren further opined that Turner's symptoms would interfere with maintaining mental alertness in any context. (R. at 123.) Overall, Warren opined that the current evaluation supported multiple diagnoses of major affective disorders and anxiety related disorders in a man whose day to day life was plagued with emotional pain. (R. at 123.) Warren opined that in the work setting, Turner was unable to cope with any stress, he could not relate effectively with peers or supervisors and his reliability and emotional stability were poor. (R. at 123.)

Warren also completed a Medical Assessment of Ability to Do Work-Related Activities. (R. at 126.) In assessing Turner's occupational adjustments, Warren found that Turner had fair ability make occupational adjustments in the categories of follow work rules, and function independently; poor ability to make occupational adjustments in the categories of relate to co-workers, use judgment, interact with supervisors, and maintain attention/concentration; and no ability to make occupational adjustments in the categories of deal with public and deal with work stresses. (R. at 126.)

In assessing Turner's performance adjustments, Warren found that Turner had good ability to understand, remember and carry out simple job instructions; and fair ability to understand, remember and carry out detailed, but not complex, job instructions and complex job instructions. (R. at 126.)

In assessing Turner's personal and social adjustments, Warren found that Turner had fair ability to adjust personally and specially in the category of maintain personal appearance; and poor ability to adjust personally and specially in the categories of demonstrate reliability, behave in emotionally stable manner, and relate predictably in social situations. (R. at 126.)

On October 29, 2003, Hugh Tenison, Ph.D., a state agency psychologist, performed a PRTF on Turner. (R. at 134.) Tenison noted in his report that Turner suffered from the following: depressive syndrome, which is characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness and difficulty concentrating or thinking; generalized persistent anxiety, which is accompanied by motor tension, autonomic hyperactivity, apprehensive expectation and vigilance and scanning; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week, social anxiety disorder and avoidant personality disorder. (R. at 137-141.) In rating Turner's functional limitations, Tenison noted that Turner had a moderate degree of limitation in the categories of restriction of activities of daily living, difficulties in maintaining social function, and difficulties in maintaining concentration, persistence, or pace. (R. at 144.) Tenison also noted that Tuner had no degree of limitation in the category of episodes of decompensation, each of extended duration. (R. at 144.)

In a mental residual functional capacity assessment, ("MRFC"), Tenison concluded that Turner was moderately limited in his ability to understand and

remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 149-150.) Tenison concluded that Turner was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions and to be aware of normal hazards and take appropriate precautions. (R. at 149-150.)

At the request of Disability Determination Services, Sharon J. Hughson, Ph.D., examined Turner on March 4, 2004. (R. at 166.) Turner reported symptoms of numbness in his left arm, sweating hands, tightness in his chest and diarrhea. (R. at 166.) Turner also stated that he was unable to get up in front of people and he avoided funerals due to the large crowds. (R. at 166.) Turner reported that he had full-blown panic attacks about once a week and this debilitated

18

him for a half day. (R. at 166.) Turner admitted to a history of heavy drinking, and stated that he quit attempting to work because he did not fit in with other people. (R. at 166.) Upon a mental status examination, Hughson found that Turner had a good general fund of information. (R. at 167.) Hughson found that Turner knew the capital of Virginia, the President of the United States and was able to recount a recent news item. (R. at 167.) Turner's thoughts were coherent and he denied homicidal or suicidal ideation, delusions, hallucinations, depersonalization or amnesia. (R. at 167.) Turner stated that he was sad most of the time because he felt like a failure. (R. at 167.) Turner indicated that he smoked one and a half packs of cigarettes per day, but denied using street drugs and reported that he had never been arrested. (R. at 168.) Hughson noted that during the examination, Turner seemed agitated and he moved his hands and feet mildly. (R. at 168.) Turner stated that he had no friends, but denied having problems with people at work. (R. at 168.) Turner stated that he had a valid driver's license and drove himself to the interview. (R. at 168.) Turner denied needing help with self-care and explained that he had lived on his own when he was working. (R. at 168.) Turner stated that he managed his own money, watched television, performed yard work, shopped, cooked, vacuumed, and did his laundry. (R. at 168.)

In the Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), test, Turner endorsed a great number of psychological difficulties, and his infrequent response pattern was reflective of some unconventional and possible bizarre beliefs. (R. at 168.) Hughson stated that the elevated MMPI-2 score could have resulted from a number of conditions such as confusion, exaggerated symptom checking or consistently misrecording his responses on the answer sheet. (R. at

169.)  Hughson noted that Turner was experiencing intense feelings of self-doubt and low morale in the context of a mixed pattern of psychological problems.  (R. at 169.) She also noted that he had major problems with anxiety and depression, that he tended to be high-strung and insecure and he might also have experienced somatic problems.  (R. at 169.)  Hughson noted that Turner felt quite insecure and pessimistic about the future, and he felt inferior, had little self-confidence and did not feel capable of solving his problems.  (R. at 169.)

In his responses to test questions, Turner endorsed a number of items suggesting that he was experiencing low morale and a depressed mood.  (R. at 169.)  Turner reported a preoccupation with feeling guilty and unworthy, and he felt that he deserved to be punished for wrongs he had committed.  (R. at 169.) Turner stated that he felt regretful and unhappy about his life, and he felt hopeless at times.  (R. at 169.)  Turner stated that he had difficulty managing routine affairs, and the items he endorsed suggested a poor memory, concentration problems and an inability to make decisions.  (R. at 169.)  Turner stated that he felt that his life was no longer worthwhile and that he had lost control of his thought process.  (R. at 169.)  Hughson opined that, according to his response content, there was a strong possibility that Turner had seriously contemplated suicide, although he denied this in the interview.  (R. at 169.)  Hughson found that Turner's response to content suggested that he felt intensely fearful about a large number of objects and activities, and such a condition may be debilitating to him in social and work situations.  (R. at 169.)

Hughson noted that Turner appeared to be quite passive and dependent in interpersonal relationships and did not speak up for himself even when others take

20

advantage of him. (R. at 170.) Hughson noted that Turner avoided confrontation and sought nurturance from others, often at the price of his own independence. (R. at 170.) Hughson also noted that Turner formed deep emotional attachments and tended to be quite vulnerable. (R. at 170.) Hughson observed that individuals with this profile are often experiencing psychological distress in response to stressful events, and such intense feeling may diminish over time or with treatment. (R. at 170.) The test also revealed that Turner was a highly introverted and interpersonally avoidant person who felt very uneasy in close interpersonal involvement. (R. at 170.) His emotional detachment appeared to be of long standing duration, and he appeared to be very insecure, lacked confidence in himself in social situations and became extremely anxious around other people. (R. at 170.) Hughson noted that individuals with this profile are typically rigid and overcontrolled, tend to worry a great deal, and may experience periods of low mood in which they withdraw almost completely from others. (R. at 170.) Hughson stated that Turner's generally reclusive behavior, introverted lifestyle and tendency toward interpersonal avoidance may be prominent in any future test results. (R. at 170.)

Hughson diagnosed Turner with caffeine-induced anxiety disorder, nicotine dependence, dysthymic disorder, panic disorder with agoraphobia and avoidant personality disorder. (R. at 171.) Hughson stated that Turner was capable of following work rules, but had difficulty dealing with people, including supervisors, coworkers and the public. (R. at 171.) Hughson opined that Turner used poor judgment at times and had little insight, he could function independently and maintained attention and concentration and he could manage complex, detailed and simple job instructions. (R. at 171.) Hughson further opined that Turner

maintained his personal appearance, was not stable emotionally and was not predictable or reliable with his avoidant behaviors. (R. at 171.)

Hughson also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (R. at 172.) In assessing Turner's occupational adjustments, Hughson found that Turner had poor ability make occupational adjustments in the categories of relate to co-workers, deal with the public, use judgment, interact with supervisors, and deal with work stresses.; and unlimited ability to make occupational adjustments in the categories of follow work rules, function independently, and maintain attention/concentration. (R. at 173.) In assessing Turner's performance adjustments, Hughson found that Turner had unlimited ability to understand, remember and carry out complex job instructions, detailed, but not complex, job instructions, and simple job instructions. (R. at 173.)

In assessing Turner's personal and social adjustments, Hughson found that Turner had unlimited ability to adjust personally and specially in the categories of maintain personal appearance; and poor ability to adjust personally and specially in the categories of demonstrate reliability," behave in an emotionally stable manner, and relate predictably in social situations. (R. at 173.) Hughson also found that Turner had no limitations based upon alcohol or drug abuse, and that Turner was able to manage benefits in his own best interest. (R. at 174.)

On February 25, March 5, March 22 and April 7, 2004, Turner visited Wise County Behavioral Health Services for evaluation. (R. at 176-208.) At Turner's initial evaluation, he stated that he had been uncomfortable at his initial visit at the

Cumberland Mountain Community Services center and therefore did not return. (R. at 191.) Turner also stated that he had a lot of depression and anxiety and that he became nervous around other people. (R. at 191.) Turner further stated that he was depressed because he had no job, no vehicle, no insurance and not way of taking care of himself. (R. at 191.) Turner was given a Global Assessment of Functioning, ("GAF"), score of 50.[2]

At Turner's March 5, 2004, visit, it was noted that his depression had a duration of five years or more, and Turner also claimed that it seemed to have gotten worse in the last 10-11 years. (R. at 194.) Turner stated that he was single, never married and living with his mother in St. Paul. (R. at 194.) He also stated that he had no children, no military service, was unemployed, had no reported major medical illnesses or diseases and had not worked since 1991 when the local DMV office in St. Paul closed. (R. at 194.) Turner stated that his activities were limited, noting that he watched television and helped his mother around the house. (R. at 194.) Turner also stated that he planted a garden in good weather and used to play the piano and painted, but admitted that he had not done the two latter activities recently. (R. at 196.) A symptoms checklist showed Turner with moderate decrease in energy or fatigue, social withdrawal, anxiety, panic attacks, avoidance behavior, worrying, inability to maintain body weight, apathy, depressed mood, feeling worthless, helplessness, hopelessness, loss of interest or pleasure, early morning wakening, insomnia and report of abuse or neglect. (R. at 197-199.)

---

[2] The GAF scale ranges from zero to 100 and "[consider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning...." DSM-IV at 32.

Case 2:08-cv-00006-GMW-PMS   Document 25   Filed 10/31/08   Page 23 of 32   Pageid#: 97

Turner was subsequently diagnosed with social phobia, dysthymic disorder and nicotine dependence. (R. at 202.)

At Turner's March 22, 2004 visit, he reported that he was a nervous wreck after driving to the session, explaining that he did not leave the house more than he had to. (R. at 177.) Turner stated that he really only left the house to go shopping either early in the morning or late at night when there were few customers. (R. at 177.) Turner stated that both his father and grandmother who lived in the family house died within a year of each other while he was in college. (R. at 77.) Turner claimed he has always been shy and that he was even voted this as a high school senior. (R. at 177.) Turner agreed to write down his potential thoughts and feelings, as well as begin walking at least three days a week at the local track or at a pond located in St. Paul. (R. at 177.) At Turner's April 7, 2004, visit, he stated that he was getting out some but he really was not enjoying it. (R. at 176.) It was noted that Turner's mood was moderately depressed as he was tearful during the session and he wrung his hands. (R. at 176.) Turner continued to verbalize his frustration at being homebound and he reported that he was walking at the pond at the Oxbow center but people he knows want to talk to him about what he has been doing recently which embarrasses him. (R. at 176.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working;

24

2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. § 404.1520 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* C.F.R. § 404.1520(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Turner v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 19, 2006, the ALJ denied Turner's claim. (R. at 266-274.) The ALJ found that Turner met the disability insured status requirements of the Act for disability purposes through September 30, 1996, but not thereafter. (R. at 272.) The ALJ determined that Turner had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 272.) The ALJ also found that prior to his last date insured, September 30, 1996, the medical evidence failed to reveal the existence of a "severe" impairment imposing significant work-related limitations based upon the requirements listed in 20 C.F.R.

25

§ 404.1520(c). (R. at 273.) Therefore, the ALJ found that Turner was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at. 273.) *See* 20 C.F.R. § 404.1520(g) (2008).

Turner argues that the ALJ erred in making his determination as to Turner's severity of medical impairments, the determination as to Turner's residual functioning capacity and abused his discretion in discrediting the medical opinions offered by the physicians who actually examined him. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 16.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's finding that Turner did not have a medically determinable severe impairment prior to September 30, 1996. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls*

26

*v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In order to obtain DIB, Turner must prove that his disability began on or before his last date insured. *See* 20 C.F.R. § 404.131 (2008.) Turner argues that he became disabled on January 31, 1991, the date he stopped working as a DMV registration agent. Turner has not engaged in substantial gainful activity at any time following his alleged onset date and his insured status for purposes of entitlement to disability insurance benefits expired on September 30, 1996. The ALJ determined that because Turner failed to submit any medical records or treatment prior to July 2003, the evidence did not show that he was disabled on or prior to September 30, 1996 and that he was thus not entitled to DIB.

Social Security Ruling, ("SSR"), 83-20 provides that:

> Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination,

e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83-20, *available at* 1983 WL 31249.

In the instant case, there are no medical records from the relevant time period because Turner did not seek psychiatric treatment until July 2003. Based on the evidence in the record, the ALJ seems well-supported in his conclusion that Turner was not disabled prior to September 1996. First, Turner did not stop working because of a medical impairment, but rather because the DMV office where he worked closed. (R. at 237.) Furthermore, after leaving the DMV, Turner had success as a student, earning average or above average grades and obtaining his college degree. Turner argues that his lifelong anxiety problems worsened after the death of his father in 1994, but the ALJ's conclusion that Turner's symptoms did not rise to the level of disability between that time and the date last insured is reasonable. The ALJ based this decision on the fact that during this time period, Turner obtained a degree in sociology and psychology, and had received no significant treatment or medication prescriptions during this time.

This case was previously remanded by this court by order dated April 26, 2006, following the ALJ's decision denying Turner's disability claim. Although the court agreed with these findings made by the ALJ, the court remanded the case

28

due to the fact that "in all but the most plain cases, a medical advisor [must] be consulted prior to inferring an onset date." *Bailey v. Chater*, 68 F.3d 75, 80 (4th Cir. 1995.) Therefore, because the ALJ in the first hearing did not consult a medical advisor in order to determine the onset date, the case was remanded for further administrative action.

In this case, the ALJ followed the direction of the court and consulted a medical expert at the hearing on July 25, 2006. Schacht elicited testimony at the hearing that does not support a finding of severe impairment through September 30, 1996. (R. at 334.) Schacht testified that, based on what he had heard and seen, Turner has social anxiety disorder, panic disorder, social phobia, avoiding personality and possible concerns about caffeine use as a possible accelerant for anxiety. (R. at 336.) When asked about whether there was evidence in the record that Turner was disabled prior to September 30, 1996, Schacht stated that there were several relevant life history records that can speak to this. (R. at 337.) He noted that, while severe impairment from an anxiety disorder might manifest itself in difficulties with attendance or reliability at school, Turner's high school record did not show any excessive absences. (R. at 337.) Schacht also noted that another possible way that a severe impairment could be manifested was with impaired academic achievement. (R. at 337.) However, he pointed out that there was no evidence of this, as Turner had a Lorge Thorndyke IQ of 106, which is average, and he graduated in the top third of his high school class, which is above average. (R. at 337.) Schacht also pointed out evidence that Turner had participated in some classes that would have required oral presentations, such as foreign language classes. (R. at 337.)

With regard to college, Turner's transcript indicated that he withdrew from four classes, but it was unclear whether those classes would have required oral presentations. (R. at 338.) Schacht noted that a letter in the record showed that Turner dropped one course after allegedly being diagnosed with elevated blood pressure at Coburn Communicare. (R. at 338.) Turner reported that the elevated blood pressure was associated with situational anxiety. (R. at 338.) Schacht stated that the remainder of his college transcript showed that the overall grade trajectory followed by the Turner's college career was upward. (R. at 339.) Although Turner failed two courses early on, he received A's and B's by his senior year. (R. at 339.)

When asked whether Turner had a disabling condition, Schacht opined that, without medical records from the period of time Turner was in college, it would be difficult to tell whether Turner did in fact have elevated blood pressure that led to his anxiety. (R. at 339.) Schacht noted that there was evidence that Turner had been drinking heavily during that time, which could have led to elevated blood pressure. (R. at 339.) Schacht testified that given the overall academic history and upward trajectory, Turner was able to function, with some accommodations on his part. (R. at 340.) Schacht noted that Turner never asked for any special accommodations from the college. (R. at 340.) He also noted that, while Turner had attempted college on prior occasions, but was unable to continue due to his anxiety, the fact that he was able to continue and complete his college degree indicated that his condition had improved. (R. at 341.) Schacht opined that Turner's more recent activities such as speaking in class or playing the piano in church are inconsistent with someone with marked impairment from social anxiety. (R. at 341.) Rather, Schacht opined that such assertions hinged on a credibility

30

determination made by the ALJ. (R. at 341.)

Schacht also was asked whether Turner's impairments were as severe during the time of his father's death in 1993 to September 1996, as they were at the time of the hearing, Schacht responded that Turner's impairments were likely to be more severe today than they were back then. (R. at 348.) Schacht reasoned that Turner's testimony indicated that he cannot do things now that he must have been able to then in order to go to school. (R. at 348.) Schacht noted that Turner testified that he can barely leave the house now; however, he must have been able to leave the house from 1993 to 1996 in order to go to college. (R. at 348.) Schacht additionally noted that after Turner's college graduation in December 1994, there are no records of his mental impairments from December 1994 to September 1996, other than Turner's testimony. (R. at 349.)

In summary, Schacht did not make any findings that Turner suffered from a severe impairment during the relevant period. Based on the evidence, which consisted primarily of Turner's testimony, Schacht opined that, because Turner was able to complete his college degree and earn average or above average grades, his impairment did not rise to the level of severity necessary to be considered disabled. Therefore, because the record is devoid of any evidence showing that Turner had a severe impairment during the period of January 31, 1991 through September 30, 1996, there is substantial evidence to support the ALJ's decision that Turner was not disabled prior to his last date insured.

*IV. Conclusion*

31

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Turner's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This ___31^st___ day of October, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:08-cv-00006-GMW-PMS   Document 25   Filed 10/31/08   Page 32 of 32   Pageid#: 106